KELVIN J. LEEKS, Petitioner v. CUMBERLAND COUNTY MENTAL HEALTH DEVEL-
OPMENTAL DISABILITY AND SUBSTANCE ABUSE FACILITY, Respondent

No. COA02-40

(Filed 19 November 2002)

**1. Public Officers and Employees— dismissal—findings**

Certain of the trial court's findings had a rational basis in the evidence in an action arising from the dismissal of petitioner as an assistant at a youth home for recording medications which were prepared but not administered.

**2. Public Officers and Employees— dismissal—falsification of medical records—unacceptable personal conduct**

In an action arising from the dismissal of petitioner as an assistant at a youth home for recording medications which were prepared but not administered, the trial court did not err by concluding that pre-writing notes describing medications not administered constituted unacceptable personal conduct. The North Carolina Administrative Code includes job-related conduct which violates state or federal law as improper personal conduct; falsification of medical records is a violation of state law.

**3. Public Officers and Employees— dismissal—findings—not supported by evidence—no reversible error**

In an action arising from the dismissal of petitioner as an assistant at a youth home for recording medications which were prepared but not administered, some of the trial court's findings concerning petitioner's sleep disorder were contrary to evidence in the whole record, but there was no reversible error because petitioner failed to prove a claim of disability discrimination.

**4. Public Officers and Employees— dismissal—disability discrimination—not proven**

In an action arising from the dismissal of petitioner as an assistant at a youth home for recording medications which were prepared but not administered, the trial court did not err by con-

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

cluding that petitioner failed to prove that his termination resulted from disability discrimination where petitioner failed to fully inform respondent of his condition, failed to prove that the depression and sleep disorder qualified as physical or mental impairment, and did not show that either condition is permanent or long-term.

Appeal by petitioner from order entered 6 June 2001 by Judge Narley L. Cashwell in Wake County Superior Court. Heard in the Court of Appeals 28 October 2002.

*Browne, Flebotte, Wilson & Horn, P.L.L.C., by Joy Rhyne Webb, for petitioner-appellant.*

*Douglas E. Canders for respondent-appellee.*

TYSON, Judge

Kelvin J. Leeks, ("petitioner"), appeals from an order which affirmed the final agency decision of the Cumberland County Mental Health Development Disabilities and Substance Abuse Facility, ("respondent"), terminating petitioner's employment. We affirm.

## I. Facts

Petitioner was rehired as a Youth Program Assistant III by respondent in December 1995 after having worked for respondent from 1981 to 1993. Petitioner worked the night shift at Borden Heights Group Home, which housed emotionally disturbed and dangerous youths.

Petitioner began suffering from depression, migraines, and a sleeping disorder. His doctor advised that he stop working the night shift. Petitioner requested a lateral transfer from the night shift to a day shift several times, beginning in May 1996. Those requests were denied.

On 22 September 1997, petitioner received a written warning that he had engaged in unacceptable personal conduct, listing: (1) not conducting proper bed checks, (2) not monitoring clients, and (3) not performing duties assigned to the lead-staff worker on a shift.

On 25 February 1998, petitioner prepared, but failed to timely administer, medications for seven of the youths. Petitioner recorded the medications by writing the date, name of medication, the number of pills administered to each client, and whether the

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

medication was taken orally on the Medication Administration Record, ("MAR"). Petitioner did not record the time or initial the MAR. Around 9:10 a.m., Everett Mitchell, petitioner's supervisor, sent petitioner home.

Petitioner arrived home and fell asleep. He awoke in the afternoon and questioned whether he had administered the medications. He called the group home, and related that he had "dreamed" the medication had not been administered. Petitioner was assured by another worker, Christopher Corders, that the medications had been given. Corders relied upon petitioner's partially completed MAR.

Petitioner returned to the group home concerned that he had forgotten to administer the medication. Petitioner checked the medicine cabinet and discovered the medication that should have been distributed that morning. Petitioner contacted Supervisor Mitchell, and completed an incident report and significant event note for each client. Petitioner called the pharmacist for further instructions concerning the medication. The medication was administered according to the pharmacist's instructions, and petitioner signed the records at the time of administration.

A pre-dismissal conference was held on 23 April 1998, followed by a subsequent meeting on 27 April 1998. On 30 April 1998, petitioner was terminated from his employment. On 28 July 1998, petitioner filed a petition for a contested case hearing with the Office of Administrative Hearings. Administrative Law Judge Morrison, ("ALJ") held the hearing on 15 December 1998 and 17 December 1998. The ALJ filed a recommended decision on 11 February 1999 which upheld the decision of the respondent's director to terminate petitioner and found that respondent had just cause to terminate. The ALJ also recommended that petitioner's allegations of disparate treatment and respondent's failure to accommodate a handicapping condition be dismissed.

The State Personnel Commission, ("Commission") considered the ALJ's recommended decision on 17 and 18 June 1999, and issued a recommendation to respondent to find and conclude that the ALJ's decision be rejected and that petitioner met his burden of proving that respondent lacked just cause to dismiss plaintiff for personal misconduct. The Commission found that petitioner's actions gave respondent just cause to take disciplinary action on the basis of inadequate job performance. The Commission recommended that

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

(1) petitioner be reinstated to his former position, (2) petitioner receive back pay and all other benefits of employment during the period he was not working, (3) respondent take appropriate disciplinary action against petitioner, and (4) petitioner be allowed to request attorney's fees.

On 15 September 1999, respondent issued its final decision concluding that there was "just cause" for petitioner's termination. Respondent dismissed petitioner's claims of disparate treatment and failure to accommodate his handicapping condition. An amended final decision was issued on 5 November 1999.

Petitioner petitioned for judicial review on 12 October 1999. Judge Cashwell heard arguments and affirmed the final decision of respondent. Petitioner appeals.

## II. Issues

The issues are (1) whether substantial evidence in the record supports the trial court's findings of fact that petitioner intentionally pre-wrote MARs and then called respondent after dreaming that he did not dispense the medicine, (2) whether petitioner's pre-writing MARs constitutes a falsification of medical records, a violation of state law, and unacceptable personal conduct, (3) whether substantial evidence in the record supports the trial court's findings of fact of petitioner's disability, and (4) whether petitioner sufficiently alleged a claim for disability discrimination.

## III. Standard of Review

Chapter 150B of the North Carolina General Statutes, the North Carolina Administrative Procedure Act, governs trial and appellate court review of administrative agency decisions . . . . Although G.S. § 150B-51(b) lists the grounds upon which a court may reverse or modify an administrative agency decision, the proper standard of review to be employed by the court depends upon the nature of the alleged error. *Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 674, 443 S.E.2d 114, 118 (1994). If a petitioner asserts that the administrative agency decision was based on an error of law, then "de novo" review is required. *Id.* . . . On the other hand, if a petitioner asserts that the administrative agency decision was not supported by the evidence, or was arbitrary and capricious, then the court employs the "whole record" test. *Id.* . . . . The standard of review for an appellate court upon an appeal from an order of the superior

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

court affirming or reversing an administrative agency decision is the same standard of review as that employed by the superior court. *In re Appeal of Ramseur*, 120 N.C. App. 521, 463 S.E.2d 254 (1995).

*Dorsey v. UNC-Wilmington*, 122 N.C. App. 58, 62-63, 468 S.E.2d 557, 559-60 (1996).

In *ACT-UP Triangle v. Commission for Health Services*, 345 N.C. 699, 483 S.E.2d 388 (1997), our Supreme Court stated, "[t]he appellate court examines the trial court's order for error of law. The process has been described as a twofold task: (1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly." 345 N.C. at 706, 483 S.E.2d at 392 (citations omitted.) The "whole record" test allows a reviewing court to determine whether an administrative decision has a rational basis in the evidence. *Id.* at 706-07, 483 S.E.2d at 392 (citations omitted).

## IV. Findings of Fact Seven and Eight

[1] Petitioner argues that the respondent's findings of fact seven and eight, later adopted by the superior court, were not supported by substantial evidence. Finding seven states, "[p]etitioner called the group home on the afternoon of February 25, 1998 advising that he had had a 'dream' that he had not given the medications that morning." Petitioner alleges that he did much more than inform respondent of a dream. Petitioner testified that he called the home, drove to the home, checked the medicine cabinet, discovered the truth of his mistake, reported the incident, and called and followed the instructions of the pharmacist.

Petitioner's testimony is corroborated by other witnesses, and clearly shows that petitioner did more than just "call[] the group home." This evidence does not contradict, but supplements the finding that petitioner called the group home and told them about his dream. Testimony of other witnesses supports this statement. The trial court's finding "has a rational basis in the evidence." *Id.*

Finding eight states that petitioner intentionally pre-wrote the client medication charts and failed to administer medications to seven youths who were to receive their medication before leaving for school that morning. Petitioner argues that the substantial evidence does not show that he pre-wrote all of the medication notes.

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

Petitioner admitted partially pre-writing the medication notes. He did not record the time of administration nor initial the record. Petitioner contends that the MAR was not complete until the MAR was signed and medication administered with the time noted and that he did not violate respondent's policy by partially pre-writing the notes. Petitioner asserts that he simply forgot to administer the medications, and this omission was not intentional.

Petitioner's testimony merely explains finding eight. This evidence does not refute the fact that petitioner intentionally partially pre-wrote false medication notes and failed to dispense the medications. There is substantial evidence in the record to support finding eight.

### V.  Conclusions of Law Five and Six

[2] Petitioner contends that conclusions of law five and six are erroneous as a matter of law, because the actions alleged are not improper personal conduct and are not supported by substantial evidence.

N.C.G.S. § 126-35 (2001) states "[n]o career State employee subject to the State Personnel Act shall be discharged, suspended, or demoted for disciplinary reason, except for just cause." "Just cause" can be established by unacceptable job performance or unacceptable personal conduct. 25 NCAC 1J.0604(c) (2002).

Title 25 of the North Carolina Administrative Code defines unacceptable personal conduct as:

(1) conduct for which no reasonable person should expect to receive prior warning; or (2) job-related conduct which constitutes a violation of state or federal law; . . . (4) the willful violation of known or written work rules; . . . or (6) the abuse of client(s) . . . .

25 NCAC 1J.0614(i) (2002).

This Court delineated the difference between unacceptable job performance and unacceptable personal conduct and held that termination for engaging in the latter category is appropriate for " 'those actions for which no reasonable person could, or should, expect to receive prior warnings.' " *Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 679, 443 S.E.2d 114, 120-21 (1994) (quoting *State Personnel Manual*, Sec. 9 at 3; 25 NCAC 1J.0604(b) (1984) (amended March 1994)). The State Personnel Manual lists,

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

"careless errors, poor quality work, untimeliness, *failure to follow instructions or procedures*, or a pattern of regular absences or tardiness[]" as examples of unsatisfactory job performance. *Id.* at 679, 443 S.E.2d at 121 (citing State Personnel Manual, Sec. 9, at 8.1-8.2). Unacceptable personal conduct includes "insubordination, reporting to work under the influence of drugs or alcohol, and stealing or misusing State property." *Id.*

Conclusions of law five and six hold that petitioner intentionally pre-wrote medication notes describing client responses to medications not administered. The court concluded this action was a falsification of medical records done willfully and intentionally, that jeopardized the care of the clients, and constituted unacceptable personal conduct.

Petitioner contends that he did not willfully falsify medical records, but instead partially pre-wrote the medication notes and neglected to administer the medications. Petitioner argues that the notes were not false until he neglected to give the medications.

Petitioner cites testimony of Emile Archambault, manager of another group home, who admitted pre-writing medication notes, to support his argument that such conduct was common and did not constitute "improper personal conduct." Petitioner asserts that if his conduct was reprehensible, it only rose to the level of unsatisfactory job performance.

Termination for "just cause" due to unsatisfactory job performance requires the employer to issue prior warnings before termination. *Parks v. Dept. of Human Resources*, 79 N.C. App. 125, 132, 338 S.E.2d 826, 829, *disc. review denied*, 316 N.C. 553, 344 S.E.2d 8 (1986). The agency must give the employee at least "one or more written warnings followed by a warning or other disciplinary action which notifies the employee that failure to make the required performance improvements may result in dismissal." 25 NCAC 1J.0605(b) (2002). Petitioner received prior warning on 22 September 1997 which cited petitioner for improper personal conduct in not performing his duties as required. This warning was insufficient to terminate petitioner's employment for "just cause" on the grounds of job performance. If petitioner's conduct rose to the level of improper personal conduct, his employment could be terminated without any warning.

Petitioner cites *Parks* to support his contention that his actions did not rise to "improper personal conduct." In *Parks*, a health care

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

technician failed to report resident abuse. *Id.* at 127, 338 S.E.2d at 827. This Court held that the negligence was a basis for unsatisfactory job performance but not improper personal conduct. *Id.* at 134, 338 S.E.2d at 830. Similarly, this Court in *Amanini* found that a terminated employee's actions, leaving his nurses' station without notifying his supervisor and abandoning his patients, fell into the category of unsatisfactory job performance. *Amanini,* 114 N.C. App. at 680, 443 S.E.2d at 121.

In both cases, this Court found the employees' behavior insufficient to terminate on the grounds of improper personal conduct. The facts at bar are distinguishable and are sufficient to terminate plaintiff for improper personal conduct under the current statute.

After *Parks* and *Amanini* were decided, the N.C. Administrative Code was amended to add "job-related conduct which constitutes a violation of state or federal law" as grounds for termination for improper personal conduct. 25 NCAC 1J.0614(i)(2) (2002).

Respondent alleges that petitioner's actions in pre-writing the medication notes violated 10 NCAC 14V.0209(c)(4) (2002), which requires that "[a] Medication Administration Record (MAR) of all drugs administered to each client must be kept current. Medications administered shall be recorded immediately after administration." This administrative rule is authorized in Chapter 122C, under which the North Carolina Department of Health and Human Services regulates the licensing and operation of facilities including the group home where petitioner worked, and has the effect of law. *Gainey v. N.C. Dept. of Justice,* 121 N.C. App. 253, 259; 465 S.E.2d 36, 41 (1996) (citation omitted).

Petitioner failed to administer the medications and falsely reported giving them to the clients. The actions of the employees in *Parks* and *Amanini* were omissions to act, not affirmative acts. Petitioner knowingly and falsely pre-wrote the medication records. While petitioner's failure to administer the medications is negligence, his pre-writing the MARs is a "falsification of medical records," a job-related violation of state law.

In addition to intentionally filling out medication administration records without actually administering the medication, the respondent and superior court concluded that petitioner also "pre[wrote] high risk intervention[, ("HRI"),] notes describing the client's responses to taking medications." This conclusion is supported by substantial evidence.

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

The record contains the HRI reports from 25 February 1998 regarding patients under petitioner's care. Petitioner's reports contain substantially the same note on every HRI. In the section titled "Narrative Summary of Activity and Client Progress," petitioner wrote "*[s]taff monitored and assisted client in taking his A.M. medication. Staff prepared and instructed client* in taking said medication. *Client evidenced progress* toward overall goal. *Staff praised client* after he took his medication." (Emphasis added).

With respect to one HRI report, the following dialogue occurred at the hearing:

Q. If you'll go about four pages in, [petitioner], where you have the HRI note.

A. Yes, sir.

Q. In the middle of the page it says, "Staff monitored and assisted client in taking his medication."

A. The same generic note, yes, sir.

Q. "Staff prepared and instructed client in taking medication. Client evident [sic] progress towards overall goal. Staff praised client after he took his medication."

A. Uh-huh.

Q. That's a false statement, isn't it?

A. Yes, that's—

Q. The client had got no medication, isn't that true?

A. Yes, sir.

Q. And you made that statement and signed it yourself, is that correct?

A. That was a prewritten statement, yes, sir.

Q. Okay. And it's false.

A. Yes, that one is.

Also, respondent asked petitioner if he "intentionally fill[ed] out these HRI notes prior to the time of the event?" Petitioner answered, "[y]es." Respondent's witness, Dr. Martin, elaborated on the possible dramatic consequences of falsely reporting drug administration. Finding this evidence credible, the trial court did not

80       IN THE COURT OF APPEALS

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

err in concluding that petitioner's acts established unacceptable personal conduct.

## VI.  Findings of Fact Seventeen through Twenty

[3] Petitioner argues that findings of fact seventeen through twenty are not supported by substantial evidence and that the trial court erred by concluding that petitioner failed to prove he was terminated for reasons associated with his handicapping condition.

Findings of fact seventeen through twenty state:

17.  The job of Youth Program Assistant (Petitioner's job) in high-risk adolescent group homes requires an employee to be able to work all shifts as needed by the Mental Health Center.

18.  Petitioner submitted a sick slip to his supervisor requesting a transfer from the night shift because of an alleged sleeping disorder, but Petitioner submitted no other medical information to the Mental Health Center to support this claim. Petitioner refused to sign a medical release form allowing the Mental Health Center to get more information from his doctor regarding his condition. He did not otherwise provide any information regarding his medical condition except his annual physical.

19.  Petitioner did not apply for other vacant YPA III positions although he was aware of their availability[.]

20.  Petitioner's physical examination completed March 5, 1998; documented no findings other than hypertension.

As to finding of fact 17, the testimony of petitioner, co-worker Mims, and Director of Child and Family Services Jenkins, showed that most YPAs worked a specific shift. There is no evidence to support this finding other than respondent's contention that petitioner was expected to work all shifts needed. Substantial evidence supports the contrary finding. Finding of fact 17 is contrary to substantial evidence in the whole record.

Finding of fact 18 is also not supported by substantial evidence in the record. The testimony of petitioner, Jenkins, and Murphy, Residential Services Supervisor, supported petitioner's contention that respondent was aware of petitioner's health problems by presentment of prescriptions. Petitioner submitted a sick slip to Mr. Mitchell, petitioner's immediate supervisor, and requested transfer to the day shift. Mr. Mitchell spoke to Diane Toler, Human Resources

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

Director for respondent. Toler advised Mitchell to try and obtain a medical release form for petitioner's doctor. Respondent never requested such a form. Respondent's policy was silent on what documentation was needed to show a disability and did not mandate a particular form. The trial court erred in concluding that petitioner only provided respondent with a sick slip. Uncontested evidence shows that petitioner also provided his prescriptions. Petitioner's failure to sign a medical release is supported by the substantial evidence. Its relevance is dubious given the testimony of petitioner that respondent never requested a form and the testimony of Toler that respondent's policy did not mandate its use.

Finding of fact 19, which states petitioner did not apply for other vacant YPA III positions although he knew of their availability, is not supported by substantial evidence. Several exhibits evidence lateral transfer requests by petitioner. The finding is not supported by any evidence and is contradicted by substantial evidence.

Finding of fact 20, that petitioner's physical examination documented no findings other than hypertension, is supported by the examination record. Petitioner alleges that the substantial evidence bears witness to petitioner's other medical problems. Presuming that to be true does not change the validity of the conclusions of the physical examination. Substantial evidence in the record supports the trial court's finding this fact.

## VII.  Disability Discrimination

[4] Although petitioner has alleged and shown there is no rational basis in the evidence for part of findings of fact 17, 18, and 19, petitioner does not assert that he is "disabled" and entitled to the protection of the North Carolina Persons with Disabilities Protection Act, ("NCPDPA") and the Americans with Disabilities Act, ("ADA"). N.C.G.S. § 168A (2001); 42 U.S.C. § 12102(2) (2001).

To prevail on an ADA claim, petitioner must prove that: (1) he has a disability as defined by the ADA; (2) he is qualified for the job; and (3) he was unlawfully discriminated against by an employer because of his disability. *Johnson v. Trustees of Durham Tech Cmty. Coll.*, 139 N.C. App. 676, 684, 535 S.E.2d 357, 363 (2000) (citing *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683 (4th Cir. 1997)). Under the ADA, the term "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual[.]" 42 U.S.C. § 12102(2)(A) (2001). "Major life activi-

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

ties" are defined as those of central importance to daily life. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197, 151 L. Ed. 2d 615, 631 (2002). "The impairment's impact must also be permanent or long-term." *Id.* at 196, 151 L. 2d. 2d at 631.

Under NCPDPA, a " '[p]erson with a disability' means any person who (i) has a physical or mental impairment which substantially limits one or more major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." N.C.G.S. § 168A-3 (2001). The term "[p]hysical or mental impairment" in this subdivision, "excludes (A) sexual preferences; (B) active alcoholism or drug addiction or abuse; and (C) *any disorder, condition or disfigurement which is temporary in nature leaving no residual impairment.*" N.C.G.S. § 168A-3 (2001) (emphasis supplied).

Petitioner discussed his headaches with Supervisor Mitchell. He also showed his drug prescriptions to Mitchell, Murphy, and Jenkins. These facts could be sufficient for respondent to find and treat petitioner as a "person with a disability." Petitioner failed to fully inform respondent of his condition. Petitioner failed to prove that the depression and sleep disorder qualify as "physical or mental impairments." There is no showing that either condition is *permanent or long-term* as required by the North Carolina statute and federal case law. N.C.G.S. § 168A-3(7)(a)(iii)(c) (2001), *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197, 151 L. Ed. 2d 615, 631 (2002).

We find no error in the trial court's conclusion that petitioner failed to prove his termination resulted from disability discrimination.

### VIII.  Summary

There was a rational basis in the evidence for the trial court to make findings of fact seven and eight. These findings support the trial court's conclusions of law five and six.

Findings of fact seventeen and nineteen were not supported by substantial evidence in the whole record. Finding twenty was fully supported, and finding eighteen was partially supported by the evidence.

Findings of fact seventeen through twenty pertain to petitioner's claim of disability discrimination. The lack of evidence to support these findings is not reversible error. Petitioner failed to prove a claim of disability discrimination.

We affirm the award of summary judgment by the trial court, that petitioner engaged in unacceptable personal conduct when he falsified the MARs in violation of state law.

Affirmed.

Chief Judge EAGLES and THOMAS concur.